UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERA SCHMIDLIN,

                Plaintiff,

                                      Case No. 2:13-cv-10552

vs.                                HON. GERSHWIN A. DRAIN

UNCLE ED'S OIL SHOPPES, INC.,

                Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#19]

### I.    INTRODUCTION

On February 9, 2013, Plaintiff Vera Schmidlin filed this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.  She alleges that her previous employer, Defendant Uncle Ed's Oil Shoppes, through its management, negligently allowed its employees to harass her based on her gender, causing her to resign on or about July 9, 2009.

Presently before the Court is Defendant's Motion for Summary Judgment [#19].  This matter is fully briefed, and the Court heard oral argument on July, 21, 2014.

Defendant raises three arguments in this motion:  (1) all of Plaintiff's claims are barred by the 90-day statute of limitations because she failed to rebut the presumption of receipt of the RTS letter; (2) Plaintiff's sexual-harassment claim fails because she was not subject to severe or pervasive conduct on the basis of her sex and Defendant was not vicariously liable for the alleged harassment; and (3) Plaintiff's retaliation claim fails because she did not follow the available complaint procedure and Defendant did not intend or reasonably foresee that she would resign.

For the reasons that follow, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## II.    FACTUAL BACKGROUND

On or about March 31, 2009, Plaintiff was hired to work as an auto mechanic at Defendant's location in Warren, Michigan.   During the hiring process, Cassie Bednarski ("Cassie"), the Store Manager who hired her, gave her a copy of the employee handbook ,which contained Defendant's complaint policy, to review and had her sign a statement acknowledging receipt of the handbook.   However, Plaintiff did not actually receive her own personal copy because the store ran out of copies, and Cassie did not review Defendant's complaint policy with her.   The policy states that an aggrieved employee should contact a store manager, a senior manager (such as a district manager), or the corporate office.   Plaintiff later admitted that she "didn't know anything" about the proper complaint procedure.

At the Warren location, Plaintiff was subjected to conduct that made her feel "uncomfortable," including (1) Durrell, a coworker, once pushing her out of the way while saying that "women don't belong working on cars" and another time saying to her that "he doesn't like white girls, he thinks that all females are bitches, they belong at home pregnant, barefoot in the kitchen;" (2) Steve Smith ("Steve"), an assistant store manager from another location who was just working at the Warren location for the day, asking her, "[W]hat do you think about having butt sex" and "[W]hat do you think females think about it;" (3) Dean Falloni ("Dean"), an employee from the Shelby location who worked at the Warren location occasionally, reading dirty jokes off his phone while she was present; and (4) general degrading comments by male employees, for example, that they wanted to get laid and that women are sex objects and "nothing but bitches."

Plaintiff reported Durrell's conduct to Cassie, who told Durrell to stop. Also, Morrease Germany ("Morrease"), an assistant store manager at the Warren location who witnessed the pushing incident, attempted to talk to Durrell about it. The discussion resulted in an argument, with Durrell threatening Morrease; Morrease claims that he filed a police report in response to the threats. Durrell was terminated shortly after—Plaintiff claims that Durrell left after Morrease filed the police report, while Defendant claims that it terminated Durrell for pushing the Plaintiff.

Plaintiff reported Steve Comments to both Morrease and Gjon Micakaj ("Gjon"), an assistant manager at the Warren location who is also Plaintiff's cousin. Gjon relayed Plaintiff's complaints to Quentin Klebber ("Quentin"), the District Manager. Concerning Dean's dirty jokes, Cassie was present at the time but only laughed. Plaintiff brought the comments of other male employee's to Cassie's attention because they were degrading to women.

At some point after all of the complaints, Plaintiff got into an argument with Cassie about people not doing their jobs, Plaintiff's complaints, and Cassie assigning her menial tasks, such as cleaning the lot or wiping down windows, instead of car repairs. In May 2009, Plaintiff asked Quentin for a transfer to another location because of her problems with Cassie. He told her, "Tough shit" and that she had to either put up with it or quit because there were no openings at other stores. Two weeks after this incident, Defendant eventually transferred Plaintiff to the location in Shelby Township, Michigan.

At the Shelby location, Plaintiff was subjected to "annoying" and "bothersome" conduct that made her feel "degraded" and "uncomfortable," including (1) Dean snapping her frequently with a towel; (2) Dean grabbing her ankles frequently; (3) Dean untying her shoes frequently; (4) Dean bumping into her frequently; (5) Dean rubbing his body into her frequently; (6) Dean once saying, "I'll see you in a week honey" and smacking her on the butt in front of Brian Wisner

3

("Brian"), the Store Manager at the Shelby location; (7) Dean staring frequently at her in a sexual fashion; (8) Dean trying to look down her shirt while she was leaning over a car; (9) Dean watching her bend over to re-tie her shoes; (10) Dean repeatedly saying, "Mmmmh" as she walked by; (11) Dean once saying, "I can tell you're wearing a thong, I wonder what color it is;" (12) Dean once saying, "[T]he things I could do with that hair backwards;" (13) Dean saying, "[H]i beautiful" to her every time she walked in; (14) Dean approaching her in an empty back room with the door closed; and (15) Lance Price ("Lance"), an assistant manager at the Shelby location who was also Plaintiff's friend, saying, "[G]irls do not deserve to work at Uncle Ed's on cars." However, Plaintiff observed Dean also engage in the first four types of conduct with male employees, but not the rubbing.

Dean bothered Plaintiff in general "more frequently than daily." Specifically concerning the rubbing against her, he did so "more than five" but "less than 10" times on a "continuous" basis—"a couple times within so many hours and then . . . later on would be another couple times." Plaintiff believes that Dean "did have a thing for me." At one point, she told him to stop, but he continued. Plaintiff complained to Brian, who told Dean to stop and later testified that he also relayed the complaint to Quentin.

When Dean approached Plaintiff in the back room, she felt an "overwhelming feeling" that she was "about to get raped." After the incident, she felt "afraid to even be around him anymore." She complained again to Brian, who said that he would talk to Dean again. She also told her cousin Gjon about the incident, and he relayed her complaints to both Quentin and Dennis Coggins ("Dennis"), the President of Uncle Ed's. Plaintiff never personally complained to anyone higher than Cassie or Brian, who were both store managers, in part because "[i]t's not my job to make Brian go to the next person up."

The last incident that occurred before Plaintiff resigned was the incident with Lance on July 9, 2009.  He was having a bad day, and in an effort to get customers' repairs finished sooner, he told her to let a faster coworker take over her work.  When Plaintiff refused, Lance got angry and said, "Vera, don't fuck with me, just help me out right now. . . . I'm not in the mood for this."  As she was walking away, he said, "[G]irls do not deserve to work at Uncle Ed's on cars."  Plaintiff knew that "he was just having a bad day" and that "[y]ou only take out the way you're feeling . . . on somebody . . . that you've known for a while that knows you compared to somebody else . . . ."  Later that day, Plaintiff resigned because she "had had enough of dealing with Lance's attitude, the sexual harassment, nobody doing anything, Brian not doing anything, nobody cared."  She subsequently hired an attorney to investigate.

In September 2009, about two months after Plaintiff resigned, she ran into Cassie, who told her that she and a female ex-employee had also been sexually harassed at Uncle Ed's.  Cassie also said that if asked, she would never admit that anybody was sexually harassed at Uncle Ed's because she did not want to risk losing her job.

On December 21, 2009, Plaintiff's attorney, filed a Charge of Employment Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").  The accompanying Notice of Appearance listed Plaintiff's correct address (which was actually Plaintiff's counsel's office address) of 30200 Telegraph Road, Suite 400, Bingham Farms, Michigan, 48025, but the cover letter listed this address without the suite number.  According to the EEOC's case log, after the EEOC made a Determination in favor of Plaintiff on September 20, 2011, Defendant rejected the EEOC's Conciliation Agreement on October 19, 2011.

According to the EEOC's case log, the EEOC mailed the Notice of the Right to Sue ("RTS") letter to both Plaintiff and Defendant on June 19, 2012.  The entire case log consists of

two initial pages preprinted with "Case Log" headings and ledger lines and a third page that is completely blank except for the RTS entry at the top of the page. On the first two pages, entries were written chronologically line after line until about two-thirds of the way down the second page, where there are nine unused lines after the bottom entry of October 20, 2011. Plaintiff's name, Defendant's name, and the charging number are only typewritten on the first page.

Defendant received the RTS letter, but Plaintiff did not. After not receiving the RTS letter for a while, Plaintiff's counsel (1) mailed an inquiry letter to the EEOC on October 19, 2012; (2) mailed another inquiry letter on January 2, 2013; (3) left a phone message with the EEOC investigator on January 8, 2013; and (4) spoke with a Ms. Hobson in the EEOC's legal department on January 8, 2013, informing her that the RTS letter had not been received.

On January 12, 2013, Ms. Hobson faxed the RTS letter dated June 19, 2012 to Plaintiff's Counsel, who alleges that this was the first time she received the RTS letter. The faxed copy of the RTS letter listed Plaintiff's address without the suite number, but the EEOC alleges that the original RTS letter was not returned undeliverable.

On February 8, 2013, the EEOC sent a letter to Plaintiff's counsel acknowledging that due to oversight, it had never mailed an RTS letter for Plaintiff's retaliation claim; the letter included a new RTS letter dated February 8, 2013 for the retaliation claim. Plaintiff filed the instant action on February 9, 2013.

### III.   LAW & ANALYSIS

#### A.  Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Supreme Court has affirmed

6

the use of summary judgment as an integral part of the fair and efficient administration of justice. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact, such that the case need not be submitted to a jury to decide. *Id.* at 323; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original). When evaluating such a motion, a court must view the evidence and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

If the movant establishes that there is no genuine issue of material fact, the burden shifts to the non-movant to identify "specific facts showing that there is a genuine issue for trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968). There must be evidence upon which a jury could reasonably find for the non-movant; neither mere allegations or denials in the non-movant's response nor a mere scintilla of evidence supporting the non-movant's position meet this burden. *Anderson*, 477 U.S. at 252, 256.

### B.  Failure to File Suit Within 90 Days of Receiving RTS

In the Sixth Circuit, a RTS letter mailed by the EEOC is presumed to have been received, and the 90-day statute of limitations begins running on the fifth day after the mailing date. *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000). However, the employee may rebut this presumption of receipt with proof that he or she did not receive notification within that period. *Id.*

7

Defendant's reliance on *Cook v. Providence Hosp.*, 820 F.2d 176 (6th Cir. 1987) as to the presumption of receipt of the RTS letter is unavailing.  In *Cook*, the EEOC mailed the RTS letter to the employee and employer, the employer received its copy, and the RTS letter sent to the employee was not returned undeliverable.  *Id.* at 178-79.  Notwithstanding these similarities, the Sixth Circuit affirmed summary judgment for the employer because an EEOC employee informed Cook via a phone call that she "should have received a Right to Sue," had actual knowledge of her right to sue.  *Id.* at 179-80.

The instant case is distinguishable because the EEOC did not verbally inform Plaintiff that she should have received the RTS letter.  In *Cook*, the court considered this dispositive due to actual knowledge of a right to sue, regardless of whether the employee in that case received the RTS letter either presumptively or actually.  *Cook*, 820 F.2d at 179 ("[W]hether or not [the employee] received the initial Notice of Right to Sue is not determinative.  Assuming, arguendo, that [she] did not receive the Notice, she admits that she had actual knowledge, from her telephone conversation, that the EEOC had given her the right to sue; yet, she unjustifiably failed to pursue her rights.").

Furthermore, Plaintiff's proofs are sufficient to rebut the presumption.  The difficult question is, of course, how can an employee-plaintiff prove that he never received a RTS letter, which requires him to prove a negative?  *See id.* at 179 n.3 ("We recognize the difficult situation in which an addressee is placed:  [W]hat evidence, other than [his] denial of receipt, is available to rebut the presumption that a letter is received?").  Sometimes, an affidavit or other sworn statement alone can rebut the presumption of receipt.  *E.g.*, *Lacheta v. Madison Cnty. Hosp.*, No. 2:08-CV-1075, 2009 WL 3515378, at *2 (S.D. Ohio Oct. 28, 2009) (affidavit); *Friedman v. Swiss Re Am. Holding Corp.*, 512 F. App'x 94, 96 (2d Cir. 2013) (complaint declared under

penalty of perjury to be true and correct); *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 37 (2d Cir. 2011) (sworn testimony).  Other times, more than an affidavit alone is needed to rebut the presumption.  *E.g.*, *Duron*, 560 F.3d at 291 (affidavit plus evidence of attempts to contact the EEOC to inquire about the status of the case); *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 526 (2d Cir. 1996) (affidavit plus date-of-receipt notation on the RTS letter); *Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1127 (9th Cir. 2007) (affidavit plus evidence of routine failure of mail delivery).  However, this district, in particular, allows an affidavit or other sworn statement alone to rebut the presumption.  *E.g.*, *Hudson v. Genesee Intermediate Sch. Dist.*, No. 13-12050, 2013 WL 6163220, at *3 (E.D. Mich. Nov. 25, 2013) (affidavit); *Isong v. Gen. Motors Corp.*, No. 04-72614, 2006 WL 931950, at *7 (E.D. Mich. Apr. 10, 2006) (deposition testimony).  In the instant case, both Plaintiff and her attorney offered affidavits stating that neither of them received the RTS letter.  Schmidlin Aff. 2, ECF No. 21-3; Cortese Aff. 2, ECF No. 21-9.  Plaintiff has successfully rebutted the presumption of receipt.

Defendant argues that unsubstantiated, self-serving assertions in affidavits (like Plaintiff's) may not be enough to rebut the presumption, *Carter v. Jack Daniel's Distillery*, No. 4:02-CV-001, 2002 WL 32059015, at *1 (E.D. Tenn. Nov. 26, 2002), Plaintiff also offered evidence of two letters sent by her attorney to the EEOC inquiring into the status of the yet-unreceived RTS letter, Pl.'s Ex. 8, ECF No. 21-8.  These letters, plus her attorney's affidavit stating two additional attempts by phone, Cortese Aff. 2, put the instant case squarely within the purview of cases like *Duron*.  In *Duron*, the employee offered evidence, in addition to an affidavit, of an email and a letter sent, and "several" calls made, to the EEOC after the RTS letter had allegedly been mailed.  *Duron*, 560 F.3d at 289-90.  The Fifth Circuit, by vacating the

9

summary judgment granted in favor of the employer, impliedly found a genuine issue of material fact as to whether the RTS letter was ever mailed to the employee.  *Id.* at 291.  In the instant case, Plaintiff too offered evidence of multiple attempts to contact the EEOC after the RTS letter was allegedly mailed on June 19, 2012.  Therefore, Plaintiff has successfully rebutted the presumption, and summary judgment for Defendant for failure to sue within 90 days of receipt of the RTS letter is denied.

### C.  Sexual-Harassment Claim

To establish a prima facie case for Title VII of sexual harassment due to a hostile work environment, an employee-plaintiff must show, by a preponderance of the evidence, that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) the employer is liable under the theory of respondeat superior.  *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008).  Defendant only disputes whether (3) any harassment was based on sex, (4) any harassment was severe or pervasive enough to constitute a hostile work environment, and (5) it had notice of the harassment and negligently failed to address it.

### 1.  *Harassment Based on Sex*

To establish that harassment was based on sex, a plaintiff must show that "but for the fact of her sex, she would not have been the object of harassment."  *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999).  Such harassment can be words or conduct that is either (1) sexually explicit; or (2) directed at, and motivated by discriminatory animus against, the opposite gender.  *Id.*

10

Some of Dean's conduct, snapping with towels, grabbing ankles, untying shoes, and bumping, was also directed at male employees. Def.'s Br. 21; Schmidlin Dep. 154:13-15, 159:6-160:14, Mar. 20, 2014, ECF No. 21-2. Dean's other physical actions and verbal comments, however, could still satisfy the but-for test. For example, Plaintiff believed that he rubbed into her because she is a woman; she did not see him do the same to male employees. Schmidlin Dep. 160:8-12. Furthermore, there is no evidence that Dean engaged in other conduct with male employees, such as looking down shirts, staring in a sexual fashion, saying "Hi beautiful," or commenting on thongs or hair.

Even though Defendant argues that the conduct of Defendant's employees was at most "inappropriate" and not "of a sexual nature," Def.'s Br. 21, such conduct could still constitute harassment based on animus against women. Notwithstanding the alleged sexual comments and actions, the Court finds that comments such as "women don't belong working on cars," Schmidlin Dep. 55:8-9, could show hostility toward the female gender. *See Williams*, 187 F.3d at 565 ("[C]onduct underlying a sexual harassment claim need not be overtly sexual in nature. *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may . . . constitute a hostile environment in violation of Title VII.") (emphasis in original). When viewed in a light most favorable to Plaintiff, Dean and Lance's conduct appears to be motivated by her gender.

### 2. *Harassment Severe or Pervasive Enough to Constitute a Hostile Work Environment*

When establishing the fourth element—harassment unreasonably interfered with work performance by creating a hostile, offensive, or intimidating work environment—a court must consider the totality of the circumstances. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). The challenged conduct in question must be both (1) objectively severe or pervasive

enough to create an environment that a reasonable person would find hostile or abusive, and (2) subjectively regarded by the employee as creating an abusive environment. *Id.* In the instant case, Plaintiff's complaint and deposition testimony has established, and Defendant has not challenged, that she subjectively regarded the resulting environment as abusive.

When establishing an objectively hostile or abusive environment, mere "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient. *Faragher*, 524, U.S. at 788 (quotation marks omitted). However, individual instances of sexual harassment that do not create a hostile environment on their own may have the aggregate effect of a Title VII violation. *Williams*, 187 F.3d at 563. Aggregate conduct must be "extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. The requisite level of "extreme" is not any higher when the alleged harassment occurred in a traditionally or stereotypically sexist environment. *See Williams*, 187 F.3d at 564 ("[A] woman who chooses to work in the male-dominated trades [does not] relinquish[] her right to be free from sexual harassment . . . . Surely women working in the trades do not deserve less protection from the law than women working in[, for example,] a courthouse."). Some factors to determine whether aggregate conduct rises to the level of "extreme" include (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's performance. *Faragher*, 524 U.S. at 787-88.

The conduct that the Court considers is:

(1)   Durrell, a coworker, once pushing her out of the way while saying that women don't belong working on cars, Schmidlin Dep. 55:8-10;
(2)   Dean "rubbing into" her repeatedly, *id.* at 162:10-164:23;
(3)   Dean once smacking her on the butt while saying, "I'll see you in a week honey," Compl. ¶ 11;
(4)   Dean staring repeatedly at her in a sexual fashion, *id.*;

(5)   Dean trying to look down her shirt while she was leaning over a car, Schmidlin Dep. 152:4-5;

(6)   Dean watching her bend over to re-tie her shoes, *id.* at 156:17-157:8; and

(7)   Dean approaching her in an empty back room with the door closed, *id.* at 166:13-19.

In addition, the complained-of verbal comments, excluding the incident with Lance, are:

(1)   Durrell generally saying that he doesn't like white girls and he thinks that all females are bitches and that women belong at home, pregnant, barefoot, in the kitchen, and cooking and cleaning, not in a man's field, *id.* at 105:25-106:3, 139:1-3;

(2)   Steve Smith, an assistant manager, once asking her what she thought about having butt sex and what she felt females think about it, *id.* at 132:18-19;

(3)   Dean repeatedly saying, "Mmmmh" as she walked by, Compl. ¶ 9;

(4)   Dean once saying, "I can tell you're wearing a thong, I wonder what color it is," *id.*;

(5)   Dean once saying, "[T]he things I could do with that hair backwards," *id.* at ¶ 10;

(6)   Dean saying, "[H]i beautiful" to her every time she walked in, Schmidlin Dep. 159:14-15;

(7)   Dean telling dirty jokes while she was present, *id.* at 140:13-25; and

(8)   Male employees generally saying that they want to get laid and calling women "sex objects" and "nothing but bitches," *id.* at 137:3-5.

For several reasons, the Court is not inclined to hold as a matter of law that there was not a hostile or abusive environment.

Concerning the frequency and severity of the incidents, Plaintiff has alleged ample incidents of conduct far more serious than "offhand comments." Defendant cited three purportedly comparable cases in which the district court properly held as a matter of law that the employee had not proven severe or pervasive conduct resulting in a hostile or abusive environment. First, in *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000), summary judgment for the employer was proper even where the employee alleged five "serious" incidents of sexual harassment, three of which were batteries that were "not merely crude, offensive, and humiliating." *Id.* at 464. Second, in *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784 (6th Cir. 2000), summary judgment was proper where the female employee alleged several dirty

jokes told in her presence, one verbal sexual advance, one reference to her as "Hot Lips," and isolated comments about her dress. *Id.* at 790. Finally, in *Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir. 2000), summary judgment was proper where the employee alleged "a single battery coupled with two merely offensive remarks over a six-month period." *Id.* at 985; *see also* 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 805-07 n.290 (3d ed. 1996) (compiling tens of cases factually comparable to *Bowman*, *Morris*, and *Burnett* in which summary judgment was granted in favor of employers because the alleged harassment was not possibly "severe or pervasive").

By contrast, multiple incidents of both general anti-female comments and sexually charged comments specifically directed at an employee raise a question of fact as to a hostile work environment. *Williams*, 187 F.3d at 563. In *Williams*, the female employee-plaintiff worked in a male-dominated, blue-collar warehouse for one year and nine months. *Id.* at 559, 564. She complained of a hostile work environment due to multiple incidents:

(1)  A supervisor looking at her breasts while saying "You can rub up against me anytime" and "You would kill me, Marilyn. I don't know if I can handle it, but I'd die with a smile on my face;"
(2)  The same supervisor, having seen her bending over, coming up behind her and saying "Back up; just back up;"
(3)  The same supervisor, having seen her write "Hancock Furniture Company" on a piece of paper, putting his arm around her neck, leaning his face against hers, and saying "You left the dick out of the hand;"
(4)  A male coworker constantly using the "F-word" as part of his vocabulary;
(5)  The same coworker saying "Hey slut" to her;
(6)  The same coworker saying "I'm sick and tired of these fucking women" before throwing some boxes at her;
(7)  Coworkers conspiring to force her to take a midnight shift;
(8)  Coworkers gluing a box of forms to the top of her desk;
(9)  Coworkers leaving a motorized buggy blocking other buggies;
(10) Coworkers stacking materials in front of the alternate exit, thereby blocking access in and out;
(11) A female coworker padlocking her inside the warehouse;
(12) Being denied overtime and breaks, unlike other coworkers; and

    (13)  Not being allowed a key to the office like other coworkers or to sit where other employees sit.

*Id.* at 559.  Even though the Sixth Circuit only considered the first three one-time incidents "not merely crude, offensive, and humiliating, but also [as] contain[ing] an element of physical invasion," the court still held that there was a question of fact as to sexual harassment.  *Id.* at 563.  The court reasoned that incidents of harassment that would be insufficient standing alone may be sufficient when viewed as a whole.  *Id.* at 562.  The court also reasoned that the multiple gender-neutral instances in which the employee was ostracized when others were not, plus gender-specific comments such as "slut" and "fucking women," created an inference "that her gender was the motivating impulse for her co-workers' behavior."  *Id.* at 565-66.

    In the instant case, Plaintiff recalled at least 15 *types* of alleged unwelcome conduct, as listed above; the actual number of *incidents* is closer to 20 or 25 because some of these actions and comments were repeated.  Moreover, of the seven *types* of alleged physical actions, three were batteries; the actual *number* of batteries is closer to ten because Plaintiff alleges that Dean rubbed into her "more than five" but "less than 10" times, Schmidlin Dep. 161:18-20.  Finally, the fact that Dean is alleged to have committed the majority of the misconduct weighs against a finding of mere "offhand comments" or "isolated incidents," especially where Plaintiff believed that he targeted her because he "ha[d] a thing for me."  *Id.* at 159:13-14.  For these reasons, the Court firmly believes that the instant case does not involve infrequent, innocuous incidents like *Bowman*, *Morris*, and *Burnett*.  The Court also believes that the instant case may be an even clearer case of sexual harassment than *Williams* because all of the alleged incidents either were sexual in nature or evinced anti-female sentiment, as opposed to the many gender-neutral pranks and mistreatment in *Williams* that still raised a question of fact.  There is at least a question of

fact as to whether the alleged conduct in the instant case was frequent and severe enough to weigh in favor of "extreme" conduct.

Even though Defendant argues that "Plaintiff's harassment claim can be narrowed down to about a one week time period," Def.'s Br. 18, misconduct must only be recurring, not prolonged. With "frequency," the question is not how long the period was during which the alleged harassment occurred, but rather whether such harassment was persistent. *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 578 (2d Cir. 1989); *Moylan v. Maries Cnty.*, 792 F.2d 746, 749-50 (8th Cir. 1986). Therefore, the fact that Plaintiff might only have worked with Dean for one week is irrelevant because an employee must only establish "a practice or pattern of harassment," which can occur during any timeframe. *Id.* at 749. If anything, the shortened period would make Dean's conduct *more* likely pervasive because all of the alleged incidents happened over the mere span of a week. For example, in *Burnett*, the Sixth Circuit mentioned that the three incidents occurred over a period of six months to stress their sporadic and isolated nature. *See Burnett*, 203 F.3d at 984 ("[T]hree alleged instances spread out at the beginning and at the end of a six-month period are not commonplace, ongoing, or continuing . . . ."). In the instant case, Plaintiff testified that Dean sexually harassed her in various ways "more frequently than daily" and rubbed into her "more than five" but "less than 10" times. Schmidlin Dep. 161:18-20, 228:13-14. If the Court were to frame these incidents like the Sixth Circuit did in *Burnett*, Plaintiff has effectively alleged that Dean alone sexually harassed her more than seven times over a quarter-month period. If anything, the one-week period weighs against Defendant's Motion for Summary Judgment.

Concerning physical threat or humiliation, Plaintiff has not expressly stated that she felt "humiliated" by any harassment, but she has alleged that she felt physically threatened on at least

16

one occasion and that she eventually had enough.  She did mention one incident—when Dean approached her in an empty back room with the door closed—where she feared imminent rape. Schmidlin Dep. 166:13-19.  As for the incidents as a whole, Plaintiff stated that she resigned because she "had had enough of dealing with . . . the sexual harassment, nobody doing anything, Brian not doing anything, nobody cared."  *Id.* at 204:22-25.  Most importantly, however, Defendant has never disputed whether Plaintiff actually felt threatened or humiliated.  Therefore, the Court believes that whether these incidents could be humiliating or threatening is at least a question of fact:  Some women in Plaintiff's shoes might have felt degraded, others might only have considered it offensive, and still others might have considered it nothing more than flirtation.  Reasonable minds could differ as to whether there was any physical threat or humiliation weighing in favor of "extreme" conduct.

Concerning unreasonable interference with work performance, a factfinder could find such interference based on the effects of harassment on Plaintiff.  To establish interference with work performance, an employee must only show that "the harassment made it more difficult to do the job."  *Williams*, 187 F.3d at 567.  In the instant case, Plaintiff stated that Dean rubbed into her "a couple times within so many hours and then . . . later on would be another couple times," characterizing this as "continuous."  Schmidlin Dep. 162:1-3.  She also testified that at one point, she told him to stop, yet he continued to rub against her.  *Id.* at 164:20-165:8.  Plaintiff further testified that she talked with Brian the next day about Dean.  *Id.* at 168:9-10.  The reasonable inferences most favorable to Plaintiff are that she was regularly interrupted while working and that she had to take time away from her duties to deal with Dean, either personally or by complaining to management.  Therefore, the Court believes that there is at least a question of fact

as to whether there was any interference of work performance weighing in favor of "extreme" conduct.

### 3. *Notice of Harassment and Negligent Failure to Address It*

To establish notice of and negligent failure to address harassment, an employee must show that "the employer, through its agents or supervisory personnel, knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 183 (6th Cir. 1992); *see also* 29 C.F.R. § 1604.11(d) (2014) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.").   Employees qualify as "supervisory personnel" if they exercise significant control over the hiring, firing, or conditions of employment of subordinate employees.  *Kauffman*, 970 F.2d at 185.

There is at least a question of fact as to whether Defendant knew of the alleged sexual harassment.  Plaintiff testified that she reported what had been going on with Durrell and Dean to Cassie and Brian, respectively.  Schmidlin Dep. 57:18-20, 168:9-10.  Plaintiff also alleges that Brian witnessed Dean smack her on the butt and say, "I'll see you in a week honey."  Compl. ¶ 11.  Both Cassie and Brian were store managers who had the authority to at least hire employees, send them home for misconduct, and assign them tasks.  Schmidlin Dep. 116:25-117:13, 142:20-143:4.   Therefore, Plaintiff's complaints to the two managers are imputed to Defendant.[1]

---

[1] An employer is also put on notice by complaints made by employees other than the plaintiff. *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999).  In the instant case, Gjon testified that he reported Plaintiff's concerns to Brian, Cassie, Quentin, and Dennis.  Micakaj Dep. 197:9-198:9, 200:2-4, Oct. 21, 2013, ECF No. 21-5.  In addition, Brian testified that he reported

Accordingly, there is at least a question of fact as to whether Defendant knew or should have known of the alleged sexual harassment.

Concerning negligent failure to address harassment, an employer is liable for harassment perpetuated by the victim's coworker only if it negligently failed to prevent harassment by controlling working conditions. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439, 2453 (2013). Relevant evidence of employer negligence includes whether the employer (1) monitored the workplace, (2) responded to complaints, (3) provided a reporting procedure, and (4) effectively discouraged complaints from being filed. *Id.* at 2453.

In the instant case, there is a question of fact as to whether Defendant failed to address Plaintiff's complaints. On one hand, it is undisputed that Defendant had a complaint policy in place. Def.'s Ex. A, ECF No. 19-1. There is also some evidence that Defendant's managers responded effectively to complaints:  After Durrell allegedly pushed Plaintiff and insulted women at the Warren store, he was sent home early that day and terminated shortly after. Schmidlin Dep. 59:2-3, 121:9. And at the Shelby store, Brian spoke with Dean about Plaintiff's complaints and relayed the complaints to Quentin. *Id.* at 188:4-5; Wisner Dep. 38:16-19, Apr. 15, 2014, ECF No. 21-4. On the other hand, there is some evidence that Defendant's managers failed to provide employees with copies of the employee handbook, which contained the complaint policy and the phone number for the corporate office. Schmidlin Dep. 125:6-11. There is also some testimony that Durrell's termination was unrelated to Plaintiff's complaint. Germany Dep. 17:17-18:5, Jan. 28, 2014, ECF No. 21-1. Finally, there is some evidence that Cassie would never have relayed Plaintiff's complaints up the chain of command for fear of losing her managerial job. Schmidlin Dep. 34:25-36:10; *see Mullins v. Goodyear Tire & Rubber*

---

Plaintiff's concerns to Quentin.  Wisner Dep. 38:16-19.  Therefore, these complaints made on Plaintiff's behalf also impute knowledge to Defendant.

*Co.*, 291 F. App'x 744, 755 (6th Cir. 2008) ("An employer cannot avoid Title VII liability for coworker harassment by adopting a 'see no evil, hear no evil' strategy."). Therefore, there is clearly a question of fact as to whether Defendant negligently failed to prevent known harassment. Accordingly, Defendant's Motion for Summary Judgment is DENIED as to the Plaintiff's Count for sexual harassment.

### D. Retaliation Claim

To establish a prima facie case of retaliation under Title VII, an employee-plaintiff must show that (1) he engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). In the instant case, Defendant only disputes the third element—whether there was an "adverse employment action" against Plaintiff.

Constructive discharge can constitute an "adverse employment action." *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001). A hostile working environment can form the basis for constructive discharge if the employee can show that (1) working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt forced to resign, and (2) the employer intended and could reasonably have foreseen the impact of its conduct on the employee. *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002). In the instant case, Plaintiff's retaliation claim fails for several reasons.

### 1. *Working Conditions So Difficult or Unpleasant That A Reasonable Person in the Employee's Shoes Would Have Felt Compelled to Resign*

While Plaintiff may be able to establish a hostile work environment for her sexual-harassment claim, she has not established that such an environment was unpleasant enough to

justify her voluntary resignation.  The elements of a constructive-discharge claim arising from a hostile work environment are closely related to those of a sexual-harassment claim, except the employee must further prove that the hostile working environment was so intolerable that resignation was a fitting response.  *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004).  Like the "extreme" element of a sexual-harassment claim, the "intolerable" element of a constructive-discharge claim looks at the severity of working conditions, but requires a higher level of severity.  *Id.* at 149.  An employee is expected to remain on the job while seeking redress, absent an extraordinary level of sexual harassment.  *Id.* at 147.

In the instant case, Plaintiff has only ever mentioned once that the working conditions[2] were *so* difficult, unpleasant, or intolerable that she could not continue working there.  *See* Schmidlin Dep. 190:4-5 ("I was afraid to even be around [Dean] anymore.").  Interestingly, the most pointed adjectives that Plaintiff otherwise used throughout her 240-page deposition to describe the situation were "annoying" twice, "degraded" once, "bothersome" once, and "uncomfortable" once.[3]  *Id.* at 157:10, 163:25, 166:21, 170:24, 192:6.  Furthermore, each time

---

[2] When examining intolerable working conditions, the Court does not consider alleged misconduct of coworkers who never worked with Plaintiff again after the alleged instances. Even though such misconduct could shed light on other issues (such as Defendant's action or inaction in response), it could not have contributed to the circumstances at the time Plaintiff resigned because the offending coworkers no longer worked alongside her.  For example, Plaintiff alleged that Durrell, while working at the Warren location, once pushed her out of the way while insulting women.  Schmidlin Dep. 55:8-10.  However, he was terminated shortly after, and she also transferred to the Shelby location.  *Id.* at 59:2-3, 62:16.  Plaintiff also alleged that Steve once asked her "what do you think about having butt sex" and "what do you feel like females think about it."  *Id.* at 132:18-19.  However, he had only been covering for an assistant manager at the Warren store that one day, and she never saw him again.  *Id.* at 133:21-23.

[3] On two other occasions, Plaintiff described the environment as "degrading," but both times she was referring to the environment at the Warren location, which she left behind when she transferred to the Shelby location.  Schmidlin Dep. 43:3, 137:2.  Plaintiff also used the adjective "uncomfortable" on two other occasions, but the first time was about Steve, with whom she only worked once at the Warren location, and the other time was about the general environment at the Warren location.  *Id.* at 133:6, 137:1.

Plaintiff so described the situation, she was not explaining why she could no longer continue working, but only how she felt. *Id.* Finally, Plaintiff conceded that the final straw—the incident with her friend Lance—was completely unrelated to her gender; she testified that he made a disparaging remark because "he was just having a bad day" and because "[y]ou only take out the way you're feeling . . . on somebody . . . that you've known for a while that knows you compared to somebody else . . . ." *Id.* at 194:15-16, 196:23-197:1. Therefore, the Court believes that Plaintiff has not established a genuine issue of material fact as to an intolerably hostile work environment.

Furthermore, Plaintiff concededly did not pursue the remedial options available under Defendant's complaint policy. An employer may defend against a claim of an "intolerable" work environment by showing that (1) it had a "readily accessible and effective policy for reporting and resolving complaints of sexual harassment," and (2) the employee unreasonably failed to make use of those employer-provided procedures. *Suders*, 542 U.S. at 134. In the instant case, Defendant's complaint policy afforded an aggrieved employee three options to lodge complaints: contact a store manager, a senior manager such as a district manager, or the corporate office.[4] Def.'s Ex. A, ECF No. 19-1. Therefore, because Plaintiff has never alleged that her complaints would not have been resolved had she tried all three alternatives,[5] Defendant has established that it had a "readily accessible and effective policy" in place.

---

[4] Even though Plaintiff alleges that she never received a copy of the employee handbook that contained this policy and the corporate office's phone number, Schmidlin Dep. 125:6-11, she did not raise this in her Response to Defendant's Motion for Summary Judgment [#21] as a counterargument to Defendant's affirmative defense.

[5] To explain why she did not complain to Quentin, Plaintiff relies on Quentin's negative response to a previous non-harassment complaint. Schmidlin Dep. 202:20-23. However, she presents no legal basis justifying her failure to complain to other senior managers or to the corporate office notwithstanding a prior unsuccessful experience with one district manager.

Plaintiff also stated that she only reported up to the level of Brian and Cassie, her store managers.  Schmidlin Dep. 202:5-9.  Plaintiff further admitted that because she "didn't know anything" about the proper reporting procedure and "[i]t's not [her] job to make Brian go to the next person up," she "took it on [her] own self to hire a lawyer and let [her] own lawyer do their own investigation."  *Id.* at 202:14-20.  In short, Plaintiff did not make use of the employer-provided procedures, did not further inquire into what she did not know, and does not now offer any tenable excuse.  Therefore, Defendant has properly asserted its affirmative defense.

### 2. *Employer Intended and Could Reasonably Have Foreseen the Impact of Its Conduct on the Employee*

The much closer question is whether the actions of Defendant's managers establish reasonable foreseeability or Defendant's intent.  However, because the Court has determined that Plaintiff has not established an "intolerable" work environment necessary for constructive discharge, the Court does not need to address this issue.  The GRANTS summary judgment to Defendant on Plaintiff's Count for retaliation.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [#19] is GRANTED IN PART and DENIED IN PART.  Defendant's Motion is GRANTED as to Plaintiff's retaliation claim and DENIED as to Plaintiff's sexual harassment claim.  This case will proceed to trial on Plaintiff's sexual harassment claim.

SO ORDERED.

Date: July 22, 2014                              /s/Gershwin A. Drain
                                                 GERSHWIN A. DRAIN
                                                 UNITED STATES DISTRICT COURT JUDGE

23